## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| BRIAN LAFALCE, individually and on behalf of all others similarly situated,<br>    Plaintiff,<br><br>v.<br><br>GENERAL MOTORS, LLC; ONSTAR, LLC; LEXISNEXIS RISK SOLUTIONS, INC.; AND VERISK ANALYTICS, INC.<br>    Defendants. | **COMPLAINT - CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

COMES NOW, Plaintiff, Brian LaFalce (the "Plaintiff"), individually and behalf of all others similarly situated, who files this class action complaint against the below referenced Defendants General Motors, LLC (hereinafter, "GM"), Onstar, LLC (hereinafter, "OnStar"), LexisNexis Risk Solutions, Inc. (hereinafter, "LexisNexis"), and Verisk Analytics, Inc. (hereinafter, "Verisk") (each individually, a "Defendant" and collectively, the "Defendants") and alleges and avers as follows on personal knowledge, investigation, or information and belief.

### I.   INTRODUCTION

1.    This case arises from Defendants' covert collection of consumers' driver behavior data through computer software installed in automobile vehicles or

via linked application, and the sharing, use, and sale of that data without consumers' notice, knowledge, or consent.

2.    Automobile vehicles are no longer simply analog machines free of computers and digital software.  Nearly every component of a modern-day automobile is integrated with, or operated by, digital electronics and software.

3.    Today, digital software records and stores a variety of metrics about a vehicle's operation, condition, and performance.  Examples include fuel levels and distances traveled.  However, the metrics captured by such digital software go beyond these general categories specific to the vehicle and encompass metrics and information about drivers and their driving behavior.  These metrics, which are digitally recorded, stored, and viewed through vehicle software and applications often inaccessible to and unknown by consumers, include, but are not limited to: a driver's average speed; percentage of time a driver drives at speeds over 80 miles per hour; the frequency and intensity of acceleration and braking; and late-night driving.

4.    Defendants GM and OnStar install these types of driver tracking features on numerous GM vehicles.  These features are misleadingly marketed as a user experience enhancement when, in actuality, the features are used by GM and OnStar to surreptitiously document and store driver-behavior metrics which are then sold for profit to third parties without the drivers' knowledge, notice, or consent.

2

5. Unbeknownst to consumer drivers, Defendants GM and OnStar sell the recorded driver data to credit agencies and data aggregation companies, including Defendants LexisNexis and Verisk.

6. Defendants LexisNexis and Verisk then sell consumer drivers' data to companies, including but not limited to auto insurance companies who then use the ill-gotten data to increase quotes and premiums for drivers' automobile insurance.

7. These acts carried out by Defendants are all done for profit without consumer drivers' notice, knowledge, or consent.

8. The covert collection of consumer driver data by GM and LexisNexis without drivers' notice, knowledge, or consent, which is sold to credit and data-aggregator companies like LexisNexis and Verisk, again without consumer notice, knowledge, or consent, comes at cost to the consumer: the result of this for-profit scheme is often an increase in consumers' insurance quotes and premiums.

9. Plaintiff Brian LaFalce is one of many drivers whose data has been sold without his consent as part of this deceitful scheme. His GM vehicle, equipped with OnStar tracking software, collected his driver behavior data without his knowledge and consent and sold that data to Defendants LexisNexis and Verisk. As a result, Plaintiff suffered economic injury, including increased insurance premiums.

10. Plaintiff brings this action for economic damages and injunctive relief on behalf of all persons whose driver behavior data were captured, collected, stored,

and/or transferred or sold without full notice or consent.  Defendants' wrongful conduct constitutes a violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et seq. (Count I); a violation of the Michigan Consumer Protection Act, Mich. Comp. Laws Ann., § 445.903, *et seq.* (Count II); tortious interference with drivers' relations with their automobile insurers (Count III); common law invasion of privacy (Count IV); and unjust enrichment (Count V).

## II.   **JURISDICTION AND VENUE**

11.    This Court has original jurisdiction pursuant to the 28 U.S.C. § 1331 by virtue of Count I arising out of or relating to the FCRA.

12.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed class is a citizen of a state different from that of Defendant, (b) the amount in controversy exceeds $5,000,000.00 (5 million dollars), exclusive of interests and costs, (c) the proposed class consists of more than 100 class members, and (d) none of the exceptions under the subsection apply to this action.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367

13.    This Court has personal jurisdiction over Defendants because Defendants have substantial aggregate contacts throughout the United States, the State of Georgia, and this District.  Defendants have engaged, and continue to

4

engage, in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, the State of Georgia, and this District, and Defendants have each purposely availed themselves of the laws of the United States and the State of Georgia.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant LexisNexis resides in this District, a substantial part of the events or omissions giving rise to the claim occurred in this District, and Defendants are subject to the personal jurisdiction of this Court.

## III.   **PARTIES**

15.     Defendant LexisNexis is a Delaware corporation with its principal place of business in Alpharetta, Georgia.  At all times relevant to this Complaint, LexisNexis obtained drivers' behavior data and made it available to third parties including automobile insurance companies, via its operations in Alpharetta, Georgia. Moreover, Plaintiff communicated with Defendant LexisNexis and was sent a copy of his consumer file from LexisNexis via its Consumer Center, which operates out of an Atlanta, Georgia address.

16.     Defendant Verisk is a Delaware corporation with its principal place of business in New Jersey.  At all times relevant to this Complaint, Verisk obtained drivers' behavior data in Georgia and made it available to third parties including automobile insurance companies.

17.    Defendant GM is a Delaware limited liability company with its principal place of business in Detroit, Michigan.  The sole member and owner of GM is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.  The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation, with its principal place of business in the State of Michigan, and is a citizen of Delaware and Michigan.  At all times relevant, GM sold vehicles in Georgia that included functionality for driving tracking software or applications, including but not limited to, OnStar, MyChevrolet, and MyCadillac.

18.    Defendant OnStar is a Delaware limited liability company with its principal place of business in Detroit, Michigan.  The sole member of the OnStar is GM, or General Motors Holding LLC or General Motors Company, as described above. At all times relevant in this Complaint, OnStar operated driving tracking software or applications in Georgia, including but not limited to OnStar, MyChevrolet, and MyCadillac.

19.    Plaintiff Brian LaFalce is a citizen of Michigan.  Plaintiff drives a 2023 Chevrolet Equinox that was manufactured and sold by GM and capable of supporting driver tracking software or applications operated or maintained by GM and/or OnStar.

## IV.   FACTUAL ALLEGATIONS

### a. Plaintiff Brain LaFalce

20.    Plaintiff Brian LaFalce purchased his 2023 Chevrolet Equinox equipped with OnStar from a GM dealer in Michigan.

21.    Plaintiff was never informed by GM or OnStar that his driver data would be collected and sold to third parties.

22.    Plaintiff did not authorize GM or OnStar to collect and sell his personal driver data.

23.    Plaintiff downloaded the MyChevrolet application for his vehicle and was not informed by the application prior to, during, or after the download of the application that his personal driver data would be collected by GM and/or OnStar and subsequently sold to third parties.

24.    Plaintiff was never informed by GM or OnStar that use of the MyChevrolet application would result in the collection of his personal driver data or that his personal data would be sold for profit to third parties, including and specifically Defendants LexisNexis and Verisk.  Plaintiff was never conspicuously informed, through his MyChevrolet application or otherwise, that he could opt-out of the collection of his driver behavior data through OnStar.

25.    Plaintiff continuously maintained his insurance coverage and was informed in 2024 that he would receive roughly a 10% premium increase in the coverage for his Chevrolet Equinox.

26.    Plaintiff requested a copy of his LexisNexis consumer file, which included 331 telematics reports recorded and transmitted by Defendants GM and OnStar to Defendant LexisNexis without his consent. These 331 reports included remarks and details on acceleration events, high speed events, hard brake events, driving times, and distances driven.

27.    Plaintiff requested a copy of his Verisk consumer file, which included approximately 100 telematics reports recorded and transmitted by Defendants GM and OnStar to Defendant Verisk without his consent.  These approximately 100 reports included remarks and details on acceleration events, speeding events, hard brake events, rapid acceleration events, driving times, and distances driven.

28.    At no time prior to or after his purchase of his GM vehicle did Plaintiff consent to the transmission of his personal driver behavior data to LexisNexis or Verisk.

29.    Upon information and belief, Plaintiff's automobile insurance company accessed his LexisNexis report which included these 331 telematics reports and/or his Verisk report which included approximately 100 telematics reports.

8

30.    Upon information and belief, the rise in Plaintiff's insurance premium was a direct and proximate result of Defendants' sale of Plaintiff's personal driver behavior data to third parties, including his automobile insurance company, without Plaintiff's consent, which constitutes unlawful deceptive acts and trade practices, an invasion of privacy, and a tortious interference, all of which served to unjustly enrich Defendants.

**b.  GM and OnStar's Covert Collection, Tracking, and Transmission of Driver Behavior Data**

31.    GM vehicles starting with model year 2015 have the capability to use OnStar software and related applications.

32.    The software and applications, including and specifically MyChevrolet, MyBuick, and MyCadillac, allow GM and OnStar to record, collect, store, and transmit data regarding vehicle condition (i.e. engine or transmission status, etc.), as well as driver specific data.  This driver specific data includes metrics with reports of average speed; percentage of time during which speed exceeds 80 miles per hour; the frequency and intensity of acceleration and braking; and late-night driving. This driver specific data is collected after each drive.

33.    Contrary to Plaintiff's experience and the reports of multiple GM consumers, GM claims that it does not enroll drivers in OnStar and does not "collect driving behavior data" without consent.  However, upon information and belief, GM

and OnStar collect, track, store, share, and sell driver behavior data irrespective of consumer consent.

34.     Moreover, GM and OnStar do not adequately apprise and inform consumer drivers that their driver behavior data will be collected, tracked, furnished, and sold to third parties.

35.     Importantly, the consumer driver is not compensated for the collection and sale of his or her data.  To the contrary, GM and OnStar are compensated for the sale of the consumer driver data to third parties who then in turn resell the consumer driver data to other third parties, including and specifically automobile insurers.

36.     To add insult to injury, the sale of the data to automobile insurers results in higher insurance quotes and premiums for those drivers whose personal and private data has been surreptitiously sold.

37.     GM and OnStar fraudulently represent that the data collected is part of "an optional service that provides customers with information about their driving behavior to help them maximize their vehicle's overall performance, reduce vehicle wear and tear and encourage safer driving."[1] However, it appears that the truth is this data collection is actually part of a surreptitious scheme used to increase revenue.

---

[1] https://www.onstar.com/support/faq/smart-driver (last accessed April 10, 2024).

38.    GM's and OnStar's disclosures do not indicate that either party will transmit or sell consumer drivers' driving behavior data to third parties or that those third parties in turn will transmit or sell that data to automobile insurance companies.

39.    GM's and OnStar's disclosures do not indicate that the ultimate sale of that driver data to third parties will result in higher premiums, higher quotes, or the possibility of being denied an insurance policy.

40.    GM and OnStar failed to give adequate notice to its customers to properly inform them of these data selling practices to third parties or the harm the practice can cause.

41.    It wasn't until March 20, 2024 that GM and OnStar admitted to the egregious data collecting and selling practice, stating, "As of March 20, 2024, OnStar Smart Driver customer data is no longer being shared with LexisNexis or Verisk."[2]

42.    Plaintiff and other class members suffered actual harm, and the risk of future harm, as a result of GM and OnStar's unfair and deceptive acts, including but not limited to the invasion of their privacy interests in their own data, loss of control over their own data, the sale of their own data without compensation, and adverse credit reporting and impaired credit scores.

---

[2] *Id*.

### c. LexisNexis and Verisk's Sale of Consumer Driver Behavioral Data

43.    According to its website, LexisNexis is "a trusted decision analytics provider for industries around the globe including financial services, retail/ecommerce, logistics and telecommunications."[3]

44.    As it relates to automobile insurers, LexisNexis states that it "help[s] insurers and automakers streamline business processes, control costs and improve customer experiences."[4]

45.    LexisNexis has an Automakers division and offers a "Telematics Exchange" system to Automakers.  LexisNexis represents on its website:

> Our device-agnostic telematics exchange receives and normalizes data from connected vehicles, mobile apps and third-party services. The driving behavior data is used to generate scores and attributes that are easily ingested into insurance carrier workflows to influence their value chain.[5]

46.    LexisNexis describes that it "bring[s] automakers and insurance carriers together" by "turn[ing] connected car data into tangible driving behavior insights that can be leveraged within insurance carriers' existing workflows."[6]

---

[3] https://risk.lexisnexis.com (last accessed April 10, 2024).

[4] *Id*.

[5] https://risk.lexisnexis.com/insurance/solutions-for-automakers (last accessed April 12, 2024).

[6] *Id*.



47.    LexisNexis collects and consolidates third-party driver data to enable automobile insurers to "boost profitability."[7]    Undoubtedly, these automobile insurers boost profitability by raising premiums.

48.    LexisNexis charges automobile insurers for driver behavioral data. According to the LexisNexis website, LexisNexis compiles data from public record as well as data received from "connected vehicles, mobile apps and third-party services."[8]

49.    LexisNexis then uses this data to "generate scores and attributes that are more easily ingested into insurance carrier workflows to help better assess risk."[9] In short, LexisNexis sells personal consumer driver data procured without consumer notice, knowledge, consent, or benefit therefrom to automobile insurers to help those

---

[7] https://risk.lexisnexis.com/insurance/auto?intcmp=ushp.risk-decision-making.body.ins-auto (last accessed April 10, 2024).
[8] https://risk.lexisnexis.com/insurance/auto/quoting-underwriting (last accessed April 10, 2024).
[9] *Id.*

automobile insurers fatten their bottom lines, which comes at a cost to those drivers whose data has been misappropriated.

50.    Verisk provides analytics data to help insurers improve their profitability and growth.  Verisk's website[10] explains that, "Insurers need innovative solutions to meet customer needs and drive growth in the face of evolving risks, regulations, and macroeconomic challenges.  As a strategic partner to the global insurance industry, our advanced data analytics, software, scientific research, and deep industry knowledge can help you along the path to profitable growth—now and in the future."

51.    On its website[11], Verisk explains that it compiles and stores driver behavior data for use by auto insurers.  It states, "Also included in Verisk's suite of solutions is the Verisk Data Exchange™, which is one of the largest telematics data exchanges of its kind and contains more than 290 billion miles of driving data from consenting drivers of connected cars.  The Verisk Data Exchange empowers auto insurers to access the driving behavior insights they need to provide telematics pricing and discounts instantly during the quoting process through the leading DrivingDNA® product family. With advanced analytics and data refinement capabilities, insurers who use Verisk's solutions can gain turnkey access to automotive

---

[10] https://www.verisk.com/insurance/ (last accessed April 25, 2024).
[11] https://www.verisk.com/company/newsroom/verisk-acquires-data-driven-safety-to-further-expand-auto-insurance-analytics/ (last accessed April 25, 2024).

telemetry that supports the development and growth of usage-based insurance. Numerous auto insurers have already connected to the Verisk Data Exchange, including four of the 10 largest U.S. carriers."

52.     Verisk also posted an article on its website[12] on November 10, 2023 explaining how auto insurers can "get back to profitability."  One of its suggestions is for auto insurers to "[l]everage connected-car telematics to elevate UBI [usage-based insurance] programs for a frictionless customer experience with a single API call, and use an insurance-ready driving score on actual driving behavior."

53.     LexisNexis and Verisk do not disclose that the driver data they sell to automobile insurers is procured from GM and OnStar without consumer drivers' knowledge or consent.

54.     LexisNexis and Verisk knowingly purchase consumer driver behavioral data that is covertly collected by GM and OnStar to the detriment of the consumers whose data has been collected.

55.     Further, this practice of covert collection of consumer driver behavioral data via scant metrics functions in such a way that it paints an incomplete picture; without proper context and additional detail, the risk reports compiled and generated by LexisNexis and Verisk are not an accurate representation of the individuals such

---

[12] https://www.verisk.com/blog/personal-auto-is-off-roading-how-to-get-back-to-profitability/ (last accessed April 25, 2024).

reports relate to.  As such, the procedures implemented by LexisNexis and Verisk do not assure maximum possible accuracy of the information concerning the individual described in the report.

56.    Based upon Plaintiff's experiences, information, and belief, this data is ill-gotten, and that ill-gotten nature is not openly disclosed.

57.    Every party incident to these transactions – GM, OnStar, LexisNexis, Verisk, and the automobile insurance companies – profits from the non-consensual, covert collection and sale of consumer driver data, except for the consumer himself. This is all to the economic detriment of consumer drivers, like Plaintiff, in the form of increased quotes and premiums.

58.    Defendants collectively engaged in unfair or deceptive acts in the conduct of trade or commerce when they engaged in the conduct of profiting from the sale of consumer driver behavior data obtained without consumer driver consent, knowing that the data would be disseminated to automobile insurance companies which resulted in harm to the consumer driver.

59.    Plaintiff and other class members suffered actual harm, and the risk of future harm, as a result of GM and OnStar's unfair and deceptive acts, including but not limited to invasion of their privacy interests in their own data, loss of control over their own data, the sale of their own data without compensation, and adverse credit reporting and impaired credit scores.

### d. Fraudulent Concealment, Tolling, and Continued Violations

60.    Plaintiff's and proposed class members' causes of action could not and did not accrue prior to the filing of this Complaint because each Defendant actively concealed and did not reveal their improper collecting, tracking, accessing, recording, storing, furnishing, or selling of driver behavior data.

61.    Plaintiff and other class members exercised reasonable diligence but could not discover each Defendant's wrongful conduct at an earlier time.

62.    Because of this, Plaintiff and other class members did not discover, nor could they have discovered through reasonable and ordinary diligence, each Defendant's deceptive, fraudulent, and unlawful conduct alleged herein. Each Defendant's fraudulent misrepresentations caused Plaintiff and other class members to believe that their driver behavior data was not being improperly accessed.

63.    In the alternative, any statute of limitation or prescriptive period is equitably tolled on account of fraudulent concealment.   Each Defendant affirmatively concealed from Plaintiff and other class members its respective unlawful conduct.

64.    Each Defendant's wrongful conduct and misrepresentation constitutes continuing violations for purposes of any limitations period.

## V.    CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action both individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) against Defendants on Plaintiff's own behalf and on behalf of the Class(es) defined below, to the extent class members from these jurisdictions can be grouped together for purposes of class treatment, and within the applicable limitations periods:

> **THE NATIONWIDE CLASS:** All persons residing in the United States who, within the applicable statute of limitations, had their vehicle's driving data collected by Defendants and shared with, for profit or otherwise, a third party without their consent (collectively, the "Class Members").

> **THE MICHIGAN CLASS:** All persons residing in Michigan who, within the applicable statute of limitations, had their vehicle's driving data collected by Defendants and shared with, for profit or otherwise, a third party without their consent (collectively, the "Michigan Class Members").

66.    Excluded from the Class(es) are: (a) any judge or magistrate presiding over this action, and members of their families; (b) each Defendant and its employees, officers, directors, and agents; (c) each Defendant's legal representatives, assigns, and successors; and (d) all persons who properly execute and file a timely request for exclusion from any Court-approved class.

67.    Plaintiff reserves the right to narrow or expand the foregoing class definitions, or to create or modify subclasses, including state-specific subclasses, as the Court deems necessary.

68.    Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the Class(es).

## NUMEROSITY

69.    While the exact number of class members cannot be determined without discovery, upon information and belief, GM and OnStar shared and/or sold millions of consumer drivers' driver behavior data to third parties including, but not limited to, LexisNexis and Verisk without their consent. The Class(es) are therefore so numerous that joinder of all members is impracticable.

## COMMONALITY AND PREDOMINANCE

70.    Common questions of law and fact predominate which include, but are not limited to:

> a.  Whether Defendants GM and OnStar collected and tracked Plaintiff's and Class Members' driving behavior data through their GM mobile application without their consent;
>
> b.  Whether Defendants' practices are an invasion of privacy;
>
> c.  Whether Defendants' practices are unfair and/or deceptive;
>
> d.  Whether Defendants' conduct was knowing and willful;
>
> e.  Whether Defendants' contracts were uniformly misleading in a way;
>
> f.  Whether Plaintiff and Class Members are entitled to actual and/or statutory damages, and the measure of such damages;

       g.  Whether Defendants should be enjoined from such conduct in the future.

71.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of himself and all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

## TYPICALITY

72.    Plaintiff's claims are typical of the claims of the Classes. Plaintiff, like all Class Members, had his driving telematics data collected and shared with third parties without his consent. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims thus arise from the same practices and/or course of conduct that give rise to the claims of all Class Members.

## ADEQUACY

73.    Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff is an adequate representative of the Classes and has no interest(s) adverse to, or in conflict with, the class(es) they seek to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex customer protection class actions of this nature.

## SUPERIORITY

74.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy.  No unusual difficulties are likely to be encountered in the management of this class action.

75.    The damages and other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants. As such, it would be impracticable for Class Members to individually seek redress from Defendants' wrongful conduct.  Even if Class Members could afford individual litigation, the court system could not.

76.    Further, individual litigation could potentially result in vastly different rulings and/or standards of conduct for Defendants.  For example, one court may enjoin Defendants' conduct whereas another may not.  The potential for such inconsistent or contradictory judgments will increase delay, burden, and expense to all parties and the court system.

77.    Here, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## <u>COUNT I</u>
**Violation of the Fair Credit Reporting Act (the "FCRA") 15 U.S.C. § 1681e(b)**
**(Plaintiff and the Class Members v. LexisNexis and Verisk Only)**

78.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

79.    Plaintiff brings this claim on behalf of himself and all similarly situated Class Members.

80.    Plaintiff and the Class Members are each a "person" and a "consumer" within the meaning of the FCRA.  15 U.S.C. § 1681a.

81.    When a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual described in the report.  15 U.S.C. § 1681e(b).

82.    LexisNexis and Verisk are each consumer reporting agencies within the meaning of the FCRA.

83.    LexisNexis and Verisk each provided information to third parties disclosing driver behavior data about Plaintiff and the Class Members in a form that constitutes a "consumer report" within the meaning of the FCRA.

84.    LexisNexis and Verisk failed to maintain procedures to maintain maximum possible accuracy regarding Plaintiff and the Class Members' driver behavior data before disseminating it to auto insurance carriers.

85.    Auto insurance carriers who received this information from LexisNexis and Verisk obtained an inaccurate representation of Plaintiff and the Class Members' driver behavior data.

86.    The foregoing acts and omissions constitute willful or negligent violations of the FCRA, including but not limited to 15 U.S.C. § 1681e(b).

87.    As a result of each willful violation of the FCRA, Plaintiff and the Class Members are entitled to actual and statutory damages pursuant to 15 U.S.C. § 1681n(a)(1), punitive damages pursuant to 15 U.S.C. § 1681n(a)(2), and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from LexisNexis and Verisk.

88.    As a result of each negligent noncompliance with the FCRA, Plaintiff and the Class Members are entitled to actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681o(a)(2) from LexisNexis and Verisk.

## COUNT II
**Violation of the Michigan Consumer Protection Act**
**Mich. Comp. Laws Ann., § 445.903, *et seq.***
**(Plaintiff and the Michigan Class Members v. All Defendants)**

89.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

90.    Plaintiff brings this claim on behalf of himself and the Michigan Class Members.

91.    Plaintiff and the Michigan Class Members are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

92.    Defendants advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

93.    As described herein, Defendants engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, which violate Mich. Comp. Laws Ann. § 445.903(1) in the following ways:

(a)    Representing that its goods and services have characteristics, uses, and benefits they do not have;

(b)    Representing that its goods and services are of a particular standard or quality if they are of another;

(c)    Failing to reveal a material fact, the omission of which tends to mislead or deceive the customer, and which fact could not reasonably be known by the customer;

(d)    Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and

(e)    Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

24

94.    Defendants' representations and omissions were material because they were likely to deceive reasonable customers about the data collection and sharing practices alleged herein.

95.    Defendants intended to mislead Plaintiffs and Michigan Class Members and induce them to rely on its misrepresentations and omissions.

96.    Plaintiffs and Michigan Class Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have reasonably discovered.

97.    As a direct and proximate result of Defendants' unconscionable, unfair, and deceptive acts and practices, Plaintiffs and Michigan Class Members have suffered and will continue to suffer injury and damages, as alleged herein, including but not limited to invasion of privacy; overpayment for auto insurance services; and decreased value of their driving telematics data.

98.    Plaintiffs and Michigan Class Members seek all monetary relief allowed by law, including the greater of actual damages or $250, and any other relief that is just and proper.

## COUNT III
### Tortious Interference with Contracts
### (Plaintiff and the Class Members v. All Defendants)

99.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

100.   Plaintiff alleges this claim for relief on behalf of himself and all similarly situated Class Members, both those in Michigan and in other states, the laws of which do not conflict with Michigan law.

101.   Plaintiff and the Class Members had contracts with their auto insurance carriers.

102.   Defendants had knowledge of these contracts and willfully and intentionally procured a breach of them without justification.

103.   Defendants' wrongful accessing, recording, storing, and furnishing of the Plaintiff and Class Members' driving data to auto insurance carriers unlawfully interfered with these contracts.

104.   Defendants intended to harm or interfere with Plaintiff or the Class Members' contracts with their auto insurance carriers.  Defendants collected and shared driver behavior data with auto insurance carriers knowing that this data could only be used to affect drivers' auto insurance rates.

105.   No privilege or other justification exists to excuse the Defendants' tortious interference.

106.   Defendants' tortious interference has directly and proximately caused Plaintiff and the Class Members to suffer damages including, but not limited to, increased auto insurance rates and an invasion of their privacy in an amount to be ascertained at trial.

## COUNT IV
**Invasion of Privacy**
**(Plaintiff and the Class Members v. All Defendants)**

107.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

108.    Plaintiff alleges this claim for relief on behalf of himself and all similarly situated Class Members, both those in Michigan and in other states, the laws of which do not conflict with Michigan law.

109.    Plaintiff and the Class Members have a right against improper intrusion into their secret and private affairs.  This includes a right of privacy in their own personal data, including their driver behavior data.  Within the confines of a vehicle, consumers have a reasonable expectation of privacy that their driver behavior is a private affair.

110.    The Defendants intentionally intruded upon Plaintiff and the Class Members' right in their secret and private affairs by intentionally accessing, recording, storing, furnishing, and/or selling their driver behavior data to auto insurance carriers through a method objectionable to a reasonable person.

111.    The Defendants' intrusion was substantial and unreasonable and led to the unwanted exposure of Plaintiff and the Class Members' private affairs.

112.    As a direct and proximate result of Defendants' intrusion, Plaintiff and the Class Members have suffered damages including, but not limited to, increased

auto insurance rates and an invasion of their privacy in an amount to be ascertained at trial.

## COUNT V
### Unjust Enrichment
### (Plaintiff and the Class Members v. All Defendants)

113.   Plaintiff incorporates paragraphs 1–98 and 107–112 as though fully set forth herein.

114.   Plaintiff alleges this claim for relief on behalf of himself and all similarly situated Class Members, both those in Michigan and in other states, the laws of which do not conflict with Michigan law.

115.   Plaintiff and the Class Members allege this Count in the alternative to the Counts above pursuant to Fed. R. Civ. P. 8(d)(2).

116.   GM and OnStar were unjustly enriched by selling GM vehicles to Plaintiff and the Class Members that contained software that tracked their driver behavior data and failing to disclose that they may sell or share that data.  GM and OnStar were also unjustly enriched because they used or sold Plaintiff and the Class Members' driver behavior data to third parties without their knowledge or consent.

117.   LexisNexis and Verisk were unjustly enriched by offering, furnishing, and/or selling the Plaintiff and the Class Members' driver behavior data to auto insurance carriers without their knowledge or consent.

118.    Plaintiff and the Class Members conferred a benefit on GM and OnStar by using or purchasing GM vehicles that contained software that tracked their driver behavior data.  Plaintiff and the Class Members also conferred a benefit on GM, OnStar, LexisNexis, and Verisk through providing their driver behavior data.

119.    Defendants realized the benefit conferred on them because they profited from accessing, offering, furnishing, or selling Plaintiff and the Class Members' driver behavior data without their knowledge and consent or without providing any financial compensation to them.

120.    It would be unjust and inequitable for the Defendants to retain the profit, benefit, and other compensation obtained as a result of their wrongful conduct without compensating Plaintiff and the Class Members.

121.    Plaintiff and the Class Members did not have an express contract with Defendants that permitted the collecting and sharing of their driver behavior data with auto insurance carriers in return for compensation.

122.    Plaintiff and the Class Members have no adequate remedy at law for the harm caused to them.

123.    Plaintiff and the Class Members seek restitution from the Defendants and request the disgorgement of all profits, benefits, and other compensation obtained by them through their wrongful conduct.

**<u>PRAYER FOR RELIEF</u>**

Plaintiff, individually and on behalf of all other Class Members, pray for the following relief that:

A.    Certifies this action as a Class Action with the Classes requested above, designates the Plaintiff as the Class Representative, and appoints the undersigned counsel as Class Counsel;

B.    Declares that all Defendants are liable on the causes of action above;

C.    Provides for preliminary and/or final injunctive relief that precludes the Defendants from further collecting and disclosing the driver behavior data of Plaintiff and the Class Members and prohibits the disclosure of any previously-collected data to any third parties without the written consent of Plaintiff and/or the Class Members;

D.    Awards Plaintiff and the Class Members with monetary relief, including actual damages, statutory damages, and punitive damages;

E.    Awards Plaintiff and the Class Members with pre-judgment and post-judgment interest to the maximum extent allowable;

F.    Awards Plaintiff and the Class Members with reasonable attorneys' fees, expert witness fees, costs, and expenses;

G.    Awards Plaintiff and the Class Members with such other relief as allowable under law.

## <u>JURY DEMAND</u>

Plaintiff respectfully requests a trial by jury on all causes of action so triable.


Date:  April 25, 2024.

<div style="margin-left: 2em;">

*/s/ Michael A. Caplan*
Michael A. Caplan
Georgia Bar No. 601039
T. Brandon Waddell
Georgia Bar No. 252639
**CAPLAN COBB LLC**
75 Fourteenth Street, NE, Suite 2700
Atlanta, Georgia 30309
Phone: (404) 596-5600
Fax: (404) 596-5604
*mcaplan@caplancobb.com*
*bwaddell@caplancobb.com*


*/s/ M. Brandon Smith*
M. Brandon Smith
GA Bar 141418
**Childers, Schlueter & Smith LLC**
1932 North Druid Hills Road, Suite 100
Atlanta, GA 30319
T:  (404) 419-9500
bsmith@cssfirm.com


Bryan L. Clobes (pro hac vice forthcoming)
Alexander J. Sweatman (pro hac vice forthcoming)
Christopher P. Dolotosky (pro hac vice forthcoming)
**Cafferty Clobes Meriwether & Sprengel LLP**
135 South LaSalle Street, Suite 3210
Chicago, IL  60603
T:  (312) 782-4880
bclobes@caffertyclobes.com
asweatman@caffertyclobes.com
cdolotosky@caffertyclobes.com

</div>

Bryan Aylstock (pro hac vice forthcoming)
D. Nicole Guntner (pro hac vice forthcoming)
Reagan Charleston Thomas (pro hac vice forthcoming)
**Aylstock, Witkin, Kreis & Overholtz PLLC**
17 E. Main Street, Suite 200
Pensacola, FL  32502
T:  (850) 202-1010
baylstock@awkolaw.com
nguntner@awkolaw.com
rthomas@awkolaw.com